UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

EDWARD RANDOLPH (14A2489)

            Plaintiff,

      v.

J. PRIEUR, A. ROSE, DOE WAGNER,
ANTHONY J. ANNUCCI, D. VENETTOZZI,
J. VANDENBURGH, DOE NEDSMITH,
JOHN DOE, JANE DOE,

            Defendants.

CIVIL RIGHTS COMPLAINT
PURSUANT TO 42 USC 1983

NO. 9:19-CV-639

U.S. DISTRICT COURT - N.D. OF N.Y.
FILED
MAY 30 2019
AT_____ O'CLOCK
John M. Domurad, Clerk - Syracuse

---

Plaintiff demands a trial by _X_ Jury _____ Court

Plaintiff Edward Randolph, pro se, for his complaint states as follows:

## II. JURISDICTION AND VENUE

1.    This is a civil action seeking relief/or damages to defend and protect the rights guaranteed by the constitution of the United States. This action is being brought pursuant to 42 USC 1983.

2.    28 USC 1331 and 1343(3) and (4) and 2201 gives the federal district courts jurisdiction over 42 USC 1983 cases.

## III. PARTIES

3.    Plaintiff Edward Randolph was confined at the Great Meadow Correctional Facility, located at Box 51, 11739 State Route 22, in the city of Comstock in the State of New York from August 9, 2016 to February 17, 2017.

4.    Plaintiff Edward Randolph is and was at all times mentioned herein an adult citizen of the United States and a resident of the State of New York.

5.    Defendant J. Prieur was at all times relevant herein employed as a correction officer at Great Meadow Correctional Facility. Defendant is sued in his individual capacity.

1.

6.     Defendant A. Rose was at all times relevant herein employed as a correction officer at Great Meadow Correctional Facility.  Defendant is sued in his individual capacity.

7.     Defendant Doe Wagner was at all times relevant herein employed as a Captain at Great Meadow Correctional Facility. Defendant is sued in his individual capacity.

8.     Defendant Anthony J. Annucci was at all times relevant herein employed as the Acting Commissioner of DOCCS at 1220 Washington Avenue, Albany, New York.  Defendant is being sued in his individual capacity.

9.     Defendant D. Venettozzi was at all times relevant herein employed as the Director of Special Housing at 1220 Washington Avenue, Albany New York. Defendant is being sued in his individual capacity.

10.     Defendant J. Vandenburgh was at all times relevant herein employed as a correction officer at Great Meadow Correctional Facility.  Defendant is being sued in his individual capacity.

11.     Defendant Jane Doe was at all times relevant herein employed as a nurse at Great Meadow Correctional facility.  Defendant is being sued in her individual capacity.

12.     Defendant John Doe was at all times relevant herein employed as the Nurse Administrator ay Great Meadow Correctional Facility.  Defendant is being sued in his individual capacity.

13.     Defendant Doe Nesmith was at all times relevant herein employed as a Physician's Assistant (PA) at Great Meadow Correctional Facility.  Defendant is being sued in his individual capacity.

## IV. PREVIOUS LAWSUIT BY PLAINTIFF

14.   Plaintiff has filed no other lawsuits dealing with the same facts involved in this action or otherwise relating to his imprisonment.

## V. STATEMENT OF CLAIM

15.   At all times herein defendants were "persons' for purposes of 42 USC § 1983 and acted under color of law to deprive plaintiff of his constitutional rights as set forth below.

## VI. STATEMENT OF FACTS

16.   On or about the 11th day of August, 2016, plaintiff was housed in the Residential Crisis Treatment Program Unit (RCTP) for mental health patients at Great Meadow Correctional Facility.

17.   During the a.m. morning rounds of the RCTP defendant J. Prieur came upon the plaintiff's cell and noticed that the plaintiff was not fully dressed in his MHU smock and that plaintiff had it folded and just barely covering his waist and buttocks.  And defendant Prieur knocked on the plexi glass panel on the outside of plaintiff's cell and ordered him to get dressed properly.

18.   The plaintiff awoke from out of his sleep and informed Prieur that he was hot (as the temperature reached above 90° that evening and morning) and he told defendant Prieur that if he placed the fan that was on the walkway labeled C.O.'s only in red ink, in the front of his cell that he would get dressed, otherwise he was not going to put the stinking heavy smock on over his body.  Defendant Prieur once again told the plaintiff to put on his smock and the plaintiff responded "leave me alone already, I just lost my grandmother recently which is why I am in here", and I got serious issues that I am working through, just leave me alone already."

3

19.   Defendant Prieur was clearly not listening or interested in what the plaintiff had been saying and told the plaintiff "get the fuck up and put on your smock, there are females that are gonna be walking through here soon to give out medication to you guys. The plaintiff then told defendant Prieur that he would not be receiving medication because he wasn't on medication at that time, and that no nurse would have any reason to come to his cell or by his cell 9as the plaintiff's cell was the last cell in a row of five) and defendant Prieur then stated aggressively that he was not asking the plaintiff, but was "telling him" to put his fucking smock on.

20.   Plaintiff then got up out of his bed and approached the front of his cell and told the defendant "leave me alone already, because its too hot in this cell to be putting on that stink, heavy as smock." It was then that defendant Prieur got up close to the cell and said "didn't you just get your ass kicked  the other day, you fucking punk, (speaking of when the plaintiff was assaulted by security staff on August 9th) you must have not learned your lesson because you got a smart ass mouth on you boy."

21.   At that time the plaintiff responded he did not get his ass kicked, he got assaulted by a bunch of cowards who took advantage of his vunerable position, and defendant Prieur stated "well you must be ready for round two." And the plaintiff stated to him that if round two meant  that he would be attacked again by cowards  then he did not care, he was ready because he planned on suing every last one of the officers who put their hands on him, as he intended to do to the first officers who attacked him.

22.   Defendant Prieur then called the plaintiff a "bitch" and a punk and began to verbally harass the plaintiff stating that the plaintiff looked to be the only coward, and he wouldn't be saying anything if he wasn't behind

4

the cell bars, and that the plaintiff was in for a rude awakening if he thought that he (the defendant) needed other officers to kick the plaintiff's ass.

23.   The plaintiff then responded back stating that the defendant was just like all the other cowards who assaulted him and was only saying everything he was saying because he had so many correction officers to back him up and that he was not going to feed into the defendant's antagonizing efforts to pull him out of his character, because he had better things to do than sit and argue with a coward, and that he was going back to sleep.  And he was not going  to be putting on his smock either because  no one was going to make him do it, especially not the defendant.  So, the defendant could do whatever he planned to do to him cause he was not worried about the defendant or the others and did not care what happened to him because unlike the other patients in the observation unit he would be released in a couple of days once mental health cleared him.  And he would be sure to report everyone who did anything to him while he was in the RCTP, because nobody would get away with putting their hands on him ever.  And defendant Prieur responded by stating that the plaintiff was just a fucking cry baby and a bitch who couldn't handle taking his little old grandmother dying and had to be sent up to the observation unit to dry like a fucking baby and sulk like a little whimp.

24.   The plaintiff then became angry and stated "fuck you" to defendant Prieur before going back over to his bed and laying back down. At which point, defendant Prieur had a side conversation with defendant Vandenburgh who had been sitting in front of the plaintiff's cell watching him on one on one suicide watch.

25.   After defendant Prieur finished his talk with defendant Vandenburgh and walked away the plaintiff called out to defendant Vandenburgh and told him that "if a nurse did come in and did need to see him that officer Vandenburgh could tell him and he would get up and get dressed, otherwise, he was going back to sleep. Defendant Vandenburgh acknowledged the plaintiff and said okay, that he would do that, at which time the plaintiff laid back down and fell back asleep.

26.   A while later the plaintiff was again awakened from his sleep by a loud banging against his cell and he noticed defendant Prieur standing outside his cell with another officer (defendant A. Rose).  Defendant Rose yelled at the plaintiff to get up and asked him if he was going to come out for his daily call out to see mental health staff.  The plaintiff got up and stated that "yes" he would be seeing mental health and he began to get dressed for his mental health interview.

27.   The plaintiff needed to make the interview because he had only been sent to Great Meadow on August 9th after learning of his grandmother's passing, and because his facility (Coxsackie Corr. Fac.) did not have an active mental health unit (RCTP) in which he could have stayed to be observed and receive mental healthcare.  So they sent him out on a ten day count to receive treatment, but the only treatment he had received since arriving to Great Meadow was the mistreatment by security staff, and he desperately needed to begin filing his complaint and grievances to challenge the assault that took place against him on August 9th when he first arrived to Great Meadow.  So, it was urgent that he see mental health and get discharged from the RCTP observation unit.  He no longer cared about getting treatment for his unstable state of mind by that point.

6

28.   Meanwhile, while the plaintiff was getting ready for his call out the inmate in the cell next to his was telling him not to come out for the call out because he felt that the officers were going to assault the plaintiff, but the plaintiff told him that it was okay, because he did not care if they did assault him he would take the beating for all the inmates that were previously assaulted and could not defend themselves through the grievance or other litigation processes.  And that he knew of other people who had lawyers that would help  him file the lawsuits against them if they did assault him (unbenounced to the plaintiff, he would not be sent back to Coxsackie and he would remain at Great Meadow and be sent to the SHU for the August 9th incident once he was discharged from the RCTP).

29.   While the plaintiff was talking to his next door cell mate defendant Rose in an agitated tone asked plantiff if he was done talking and ready to go and approached his cell and ordered him to step up to the gate and put his hand through the feed up hatch to be cuffed and shackled.  After being cuffed the plaintiff was ordered to turn around so the waist chain could be secured around his waist, and the plaintiff id as he was directed to do.  Once the waist chain had been secured around his waist defendant Rose removed the cell keys from his waist and proceeded to open the cell door.

30.   As the cell door was opened the plaintiff was directed to step backwards out of the cell by defendant Rose, and just as the plaintiff cleared the doorway he was viciously punched to the side of the face from behind and he stumbled backwards into defendant Rose and the cell door before having several other punches thrown at him in rapid succession while defendant Rose held tightly to the waist chain, positioning himself out of the way of the attack by defendant Prieur and allowing for the plaintiff to continue to fall backwards into the wall before he landed on the floor

against the rear wall of the hallway.

31. Plaintiff being handcuffed and shackled by the waist had no way to recover his balance or to block the punches to his head and face, and he fell hard to the floor.

32. Defendant Prieur continued to throw punches at the plaintiff's face as he sat against the wall. And moments later other security staff began to show up and defendant Rose yelled out that the plaintiff had taken a kick at defendant Prieur.

33. The plaintiff knew that he was being set up then and someone yelled "get him up" and the plaintiff was snatched up off of the floor and he immediately began saying that he did not do any such thing as defendant Rose had alleged he'd done, and he was ordered by the officer to shut up and keep quiet as they placed him up against his cell.

34. While standing against the cell someone began to place leg shackles on his feet and he heard someone ask "what happened" so thats when the plaintiff turned his head  to see and he saw a bunch of officers and Sergeants were standing in the hall. One of the officers responded to the question and said he took a kick at Prieur. The plaintiff immediately began to and stated he did not do anything to anybody and it was then that a Sergeant came at him in a threatening manner and yelled into his face "shut the fuck up nigger, nobody asked you shit." So, the plaintiff being shocked at being called a nigger just stood staring into the Sergeant's face. That's when the Sergeant removed his canister of O.C. pepper spray and ordered the plaintiff to turn his face around before he sprayed him. The plaintiff continued to stare for a moment before finally turning away and someone had then ordered him to spread his legs apart, which he did, and as soon as he did that person stepped down on the shackles chain forcing the cuffs around

his ankles to dig into his flesh.

35.   That is when the Sgt. ordered someone to go get the use of force camera and he asked if anybody wanted to get any punches in before the camera started and one of the officers standing behind the plaintiff punched him to the back of the head, and someone else called out "nah I'm good" and they began to talk to each other about where the plaintiff was and from what block he came from and someone said he's not from here he's from Cox.

36.   Other inmates in the Unit at that time began yelling out that the plaintiff was assaulted and that he did not do anything, and that the officers had set him up to be beat up once he came out of his cell. They were yelling and banging in the plaintiff's defense, but they were threatened and told to shut the fuck up.

37.   After having that brief encounter with the Sgt. the plaintiff had put in his head that he would wait until the use of force video was started before he said anything else about what had taken place, and as soon as it did start the plaintiff began to yell out loudly so that the camera's small microphone would pick up his voice clearly.  And he began to state everything that had took place from when he came out of the cell, and that he never took a kick at the defendant and he addressed the Sgt. who called him a "nigger" as well (see use of force video footage in support of this claim by the plaintiff).

38.   Due to the plaintiff being upset and clearly agitated, he was delayed in being escorted to the facility infirmary and he was placed back into his cell where he continued to rant until he was calm enough to be escorted to the infirmary.  But the plaintiff feeling safe from any further assault now that the camera was running, continued to voice hisself loudly for the purpose of the use of force video.

39.  The plaintiff eventually calmed down to be escorted to the infirmary and was examined by defendant Nesmith (PA) who noted that the plaintiff had minor contusion to his left upper arm and dried blood in his nostril. The defendant did not document any of the plaintiff's other clearly evident injuries to his face and forehead, and noted that the plaintiff was agitated and uncooperative for x-rays to be taken, but the plaintiff was eventually examined and was given the x-rays that were alleged to be negative for fractures or breaks of any kind.

40.  The plaintiff complained of having jaw pain and headaches as well as difficulty breathing out of his nose.  Plaintiff was never given any aspirin or pain medication.  In fact, the medical staff, namely, the defendant P.A. Nesmith deliberately down played the plaintiff's injuries in an attempt to cover up the actual seriousness of plaintiff's injuries in order to protect the defendants involved in the assault from full responsibility of their excessive use of force and failed to provide adequate medical treatment to the plaintiff as a result.

41.  Immediately following this incident the plaintiff received a misbehavior report alleging falsified prison rule violations that consisted of 104.11 violent conduct, 106.10 Direct Order, 107.11 interference, 104.13 creating disturbance, and 109.12 movement regulations.

42.  At his tier hearing on the charges the plaintiff pleaded "not guilty" to all of the charges against him and made several requests for numerous inmate and staff witnesses as well as documentary evidence in support of his defense.

43.  On September 16,2016 while at the initial commencement of the disciplinary proceeding the hearing officer blatantly violated the plaintiff's due process rights by refusing to call the requested witnesses

10

and to provide the plaintiff with the requested material documentation.

44.   On September 16, 2016 the plaintiff was subsequently found guilty of all the charges filed against him by the hearing officer and the penalty imposed was 365 days SHU and loss of all his privileges.

45.   On September 16, 2016 the plaintiff filed an administrative appeal to the office of the Commissioner of DOCCS, defendant Anthony J. Annucci.

46.   On December 1, 2016 the Director of Special housing notified the plaintiff via correspondence that his September 16th hearing was reviewed and administratively "modified" from the original 365 days to 270 days.

47.   The plaintiff soon thereafter contacted his lawyer at Prisoner's Legal Services who prepared a Superintendent Appeal and reconsideration of defendants review of the plaintiff's appeal, and on January 18, 2017 the Director of Special Housing, defendant D. Venettozzi, contacted the plaintiff via memo and notified him that  his September 16th hearing was again reviewed and "reversed" with the order to have the matter remitted for a rehearing.

48.   During the commencement of the rehearing the plaintiff submitted evidence of the hearing being conducted in direct violation of the department own regulations and policies on "timeliness, support of his defense against the charges as well as introducing evidence showing numerous inconsistencies within the security witnesses testimonies, and he also called several inmate witnesses who could no longer remember the incident clearly, or whom were completely unavailable to testify due to the excessive amount of time that had passed between the initial date of the incident and the date of the rehearing.   But the plaintiff still managed to offer an exceptional defenseand made clear objections to all the violations of his due process, including the denial by the hearing officer to allow the  plaintiff to give a

11

physical demonstration of the alleged kicked that took place, so that the plaintiff could show that while wearing the MHU smock he could not have lifted his fact high enough off of the ground to have kicked the defendant J. Prieur in his groin as was being alleged by the defendant and his fellow officer defendant Rose.   The physical demonstration would have certainly proven the plaintiff's innocence at his proceeding and it is believed that the hearing officer knew of this which is why he denied the plaintiff the opportunity to physically demonstrate the kick.

49.  On May 20, 2014 the plaintiff was again subsequently found guilty of all the charges against him, with the exception of two of the charges that he was found not guilty of violating.

50.  On May 20, 2014 the plaintiff filed an administrative appeal challenging the violations that took place against him at his disciplinary proceeding.

51.  On July 20, 2014 the Director of Special Housing again contacted the plaintiff by memo to notify him that his May 20th hearing was reviewed and "modified" from 270 days to 140 days with 40 days suspended and with the recommendation of three months loss of good time credit as opposed to the initial six months penalty that was imposed by the hearing officer.

52.  It should be noted for the record of this proceeding that the plaintiff is currently awaiting decision from the state courts on an Article 78 Petition challenging the disciplinary proceeding as well as the penalty imposed of the loss of "good time" credits, and the plaintiff Edward Randolph hereby waives and forever abandons any legal claims he has or may have with regard to the loss of good time stemming from the May 20th disciplinary hearing, in reliance upon the decision and holding of the

12

United States Court of Appeals for the Second Circuit in <u>Peratta v. Vasquez</u>, 464 F3d 98 (2d Cir. 2006).

53. It should also be noted for the record of this proceeding that by the time the plaintiff received the final administrative decision of July 20, 2017 modifying the penalty imposed by the hearing officer on May 20, 2017, he had already been confined to the SHU for a total period of ten (10) months which is approximately 312 days or more.

### VII. EXHAUSTION OF ADMINISTRATIVE REMEDIES

54. Please see exhibit A for proof of administrative remedies for first claim of 14th Amendment due process violations.

55. The plaintiff also made a diligent attempt to fully exhaust his administrative remedies for Eight Amendment violations to be free from cruel and unusual punishment (assault by staff) in the filing of numerous facility grievances and complaints, but due to the mishandling of his out-going and incoming mail by security staff his correspondence of said grievances and appeals were not received.  So, the plaintiff filed letters of complaint and reconsiderations to file late grievances and appeals, but he was ultimately denied by the I.G.R.C. (Inmate Grievance Resolution Committee).  Please exhibits B thru Y) for all communications by the plaintiff to the I.G.R.C. and director of the inmate grievance programs for all of the plaintiff's efforts to exhaust his administrative remedies.

56. The plaintiff also filed several grievances on behalf of the inadequate medical care/treatment he received which are also supported by the attached exhibits as well in exhibit C.  None of the plaintiff's correspondence reached it's destination because the correction officers were taking his mail and disposing of it.  So, the plaintiff was forced at times to use

13

other inmates to send out the letter and communications that did eventually make it to the respective parties addressed in his communications, but often times it was too late for the plaintiff to file his appeals or grievances.

## VIII. CAUSES OF ACTION

First Cause Of Action

57. Due process violations-confinement due to mistakes or in absence of due process 14th Amendment violations.

58. The plaintiff was unlawfully confined to the SHU for ten months after having a disciplinary proceeding that was conducted in direct violation of his rights to due process, which deprived him of amenities in his prison living conditions and loss of limited liberty enjoyed by most prisoners resulting from this unlawful confinement.

Second Cause Of Action

59. Inadequate medical care/deliberate indifference Eight Amendment violation.

60. Defendant Doe Nesmith exercised deliberate indifference to plaintiff's health by failing to provide adequate medical care to the plaintiff following the attack against him by defendants Prieur and Rose.

61. Defendant Nesmith intentionally did not note the full extent of the plaintiff's injuries, did not administer pain medications, and refused to fufill any of the plaintiff's request for follow-up care. Instead defendant Nesmith mocked the plaintiff in front of other medical and security staff by laughing at him and calling him a sissy and telling him to stop acting like a baby, and that he would surely heal from his injuries because they weren't that serious.

14

62.   As a direct result of defendant Nesmith's deliberate indifference to the plaintiff's condition, plaintiff suffered further pain and mental anguish and he continued to suffer from migraine headaches which he is now receiving medication for after finally getting treatment in November, 2017 while at CNYPC Hospital for the mentally ill.

63.   The plaintiff also continued to suffer from difficulty breathing out of his nose, jaw pains and general pain throughout his body from the hard fall he'd taken to the floor.  In addition, plaintiff was unable to eat properly for days after receiving no care from defendant Nesmith (PA) because his jaw was tight and it caused him a great deal of pain to chew any food.

Third Cause Of Action

64.   Excessive use of force-assault by staff-Eight Amendment right to be free from assault/cruel and unusual punishment.

65.   The plaintiff suffered physical and emotional abuse at the hands of correctional staff (correction officers) and sustained numerous injuries as a result of this malicious, sadistic and intentional assault against him by the defendants.

Fourth Cause Of Action

66.   Retaliatory treatment for filing section 1983 claim and for filing grievances and complaints.

67.   Almost immediately after the plaintiff filed grievances and complaints against the defendants J. Prieur and A. Rose, plaintiff suffered retaliation by other security staff who began to harass the plaintiff by denying him food, showers, destroying his personal property and filing false misbehavior reports against him.

15

68.   Days after the plaintiff was placed in the SHU he began to file
numerous complaints and grievances in order to exhaust his administrative
remedies for his 1983 claims, and it was at that time that he began to suffer
from harassment  and accumulated numerous falsified misbehavior reports, and
soon thereafter discovered  that all four (4) bags of his personal property
was thrown out and destroyed by security staff once it arrived from his
previous facility.

69.   The plaintiff also suffered from the verbal harassment and abuse of
security staff who called him names like "rat" and "snitch", and threatened
to assault him again if he ever came out of his cell.  So, the plaintiff was
afraid to leave his cell for anything, even showers, but he wrote numerous
complaints to the Superintendent, the Commissioner of DOCCS and to the
Assembly Chairman asking to be transferred out of the facility.

70.   And all of this was done specifically because the plaintiff filed
grievances and complaints and let it be known that he indeed intended to sue
the defendants.  There was no other excuse for the constant harassment the
plaintiff suffered.  These officers made their intentions quite clear when
they had referred to the plaintiff as a "rat" and a "snitch" who liked to
file complaints, and that he would learn the hard way after messing with one
of their own.

71.   They also stated that it did not matter how many complaints or
grievances the plaintiff filed because the plaintiff wasn't going to be
getting any money, and that nothing was going to be done to them because all
correction staff stuck by one another and showed support to each other, so
the plaintiff should just abandon any hope of ever winning in any way against
them.

72.  These acts represent a pattern of events demonstrating intentional retaliation against the plaintiff by defendants and their fellow security officers who were either told or learned of the assault against the plaintiff and the plaintiff's intention to file a lawsuit against the defendants, along with all his complaints to the Office of Special Investigation (OSI) after the OSI sent investigators  to the prison to interview the plaintiff on behalf of his complaints.   And these actions have caused the plaintiff further mental anguish.

## IX. PRAYER FOR RELIEF

73.  The plaintiff request an order declaring that the defendants have acted in violation of the United States Constitution.

74.  The plaintiff seeks compensatory damages in the amount of $75,000 for the loss of amenity in his prison living conditions, and loss of the limited liberty enjoyed by prisoners, resulting from his segregated confinement, in that he was confined for 23 hours a day in a cell roughly 60 square feet and deprived of most of his personal property as well as the ability to work, attend educational and vocational programs, watch television, associate with other prisoners, attend outdoor recreation in a congregate setting with the ability to engage in sports and other congregate recreational activities, to attend religious services and utilize the telephone regularly to call his family and friends.

75.  The plaintiff also seeks punitive damages against defendants Wagner (hearing officer), Anthony J. Annucci and D. Venettozzi in the amount of $100,000 for their willful and malicious conduct in confining the plaintiff to segregation after deciding on a disciplinary proceeding that was clearly conducted in direct violation of the plaintiff's  clearly established procedural and constitutional rights to due process of law.

17

76.   The plaintiff also seeks punitive damages against defendants Prieur, Rose and Vandenburgh in the amount of $600,000 for their malicious, intentional and sadistic conduct of assaulting the plaintiff and causing him to suffer from physical and emotional injuries

77.   The plaintiff also seeks punitive damages against defendant Nesmith and other unnamed nursing staff in the amount of $200,000 for their deliberate and intentional indifference, and conduct in denying the plaintiff adequate and immediate medical care, and for providing the limited information on the nature true extent of the plaintiff's actual injuries in his medical records to protect the officers involved in the assault against the plaintiff from liability.

78.   The plaintiff hereby names correction officer, defendant Vandenburgh as a defendant because it is believed by the plaintiff that the named defendant knew of the pending assault against him, and that he did not do or say anything to prevent it, but instead acted in part to allow for defendant Prieur to physically assault and abuse the plaintiff. And, for him providing false and fabricated information against the plaintiff during his given testimony at the plaintiff's disciplinary procedding.

79.   The plaintiff also hereby names defendant Rose as a defendant because it is also believed by the plaintiff that the defendant knew of the pending assault against him,  and rather than act in a manner to help alleviate and prevent the assault from taking place, he instead, acted in part to allow for defendant Prieur to physically assault and abuse the plaintiff.  As well as providing the false and fabricated  statements and testimony on behalf of his fellow officer within the use of force memorandum he authored and submitted in connection to this incident and the testimony provided at the plaintiff's discviplinary proceedings.

18

WHEREFORE, Edward Randolph prays for judgment in his favor and damages in his favor against all named defendants in an amount sufficient to compensate him for the pain and mental anguish suffered by him due to the deliberate indifference and intentional misconduct of defendants , but in no amount less than $600,000 together with his attorney fee and cost, and such additional relief as the Court may deem just and proper.

Date: *January 18, 2019*

Respectfully submitted,

Edward Randolph

19

## VERIFICATION OF PETITION

STATE OF NEW YORK)
                 ) ss.:
COUNTY OF CHEMUNG)

_Edward Randolph_, being duly sworn, deposes and says that

deponent is the Petitioner in the above encaptioned proceeding, that

he has read the foregoing Petition and knows the contents thereof,

that the same is true to deponent's own knowledge, except as to those

matters therein stated upon information and belief, which matters

deponent believes to be true.

_____

Sworn to before me this

_15_ day of _February_, 20 _19_

_____
       NOTARY PUBLIC

STEVEN D. LEE
Notary Public, State of New York
Chemung County, 01LE6231045
Commission Expires Nov. 15, 20_22_