## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

EDWARD RANDOLPH,

Plaintiff,

v.

9:19-CV-639
J. PRIEUR, Corrections Officer                              (DNH/ATB)
Great Meadow Correctional Facility, et al.,

Defendants.

EDWARD RANDOLPH,

Plaintiff,

v.

9:19-CV-640
L. RENAUD, Corrections Officer                             (DNH/ATB)
Great Meadow Correctional Facility, et al.,

Defendants.

EDWARD RANDOLPH, Plaintiff, pro se
CHRISTOPHER J. HUMMEL, Asst. Attorney General, for Defendants

ANDREW T. BAXTER, United States Magistrate Judge

### REPORT-RECOMMENDATION

This matter has been referred to me for Report and Recommendation by the

Honorable David N. Hurd, United States District Judge.  Presently before the court in

this consolidated civil rights action is defendants' motion for summary judgment

pursuant to Fed. R. Civ. P. 56.[1] (Dkt. No. 62).  Despite being given two extensions of

---

[1] I issued a previous Report-Recommendation on July 31, 2020, after a motion to dismiss filed by defendants Annucci and Venettozzi based on personal involvement. (Dkt. No. 38).  The district court approved and adopted the Report-Recommendation on September 30, 2020. (Dkt. No. 42).  The motion was granted in part and denied in part, resulting in dismissal of the entire complaint as against defendant Acting Commissioner of the Department of Corrections and Community Supervision ("DOCCS") Anthony Annucci and partial dismissal as against defendant Director of Special Housing D. Venettozzi. (*Id.*)  In my recommendation, I noted that defendant Venettozzi was free to file a properly supported motion for summary judgment. (Dkt. No. 38 at 14, Dkt. No. 42 at 2).  Defendant Venettozzi has joined in the current motion.

time to respond to the motion, plaintiff has failed to do so. (Dkt. Nos. 66, 70).

## I.    Facts

The amended complaint in this action asserts claims of excessive force and denial of medical care, together with procedural due process violations. (Amended Complaint ("AC")) (Dkt. No. 19).[2]  The claims relate to incidents dated August 9, 2016 and August 11, 2016, while plaintiff was housed at the Great Meadow Correctional Facility ("GMCF").  Plaintiff alleges that excessive force was used against him on both occasions.  A misbehavior report was issues against him after each incident, resulting in disciplinary hearings about which he makes the procedural due process claims.[3]  I have included the basic facts in this section.  Additional facts, contained in the record pertaining to each incident will be discussed in my analysis of the various claims.

### 1.    August 9, 2016 Incident[4]

Plaintiff alleges that, while he was incarcerated at Coxsackie Correctional Facility on August 9, 2016, he was informed that his grandmother passed away, and he was sent to the facility mental health unit for evaluation. (AC2 ¶ 18).  However, in

---

[2] As I noted in my Report-Recommendation of July 31, 2020, the AC is a "consolidated" amended complaint. (Dkt. No. 19).  However, plaintiff has simply attached two separate complaints together, making the "consolidated" AC difficult to review because there are similar allegations on different pages of the complaint, at different numbered paragraphs, which do not always contain identical statements.  The defendants' exhibits have clarified the facts somewhat.  I will refer to the "first" amended complaint as "AC1" and the second, as "AC2", citing to the paragraphs in each AC as assigned by the plaintiff within the document.  AC2 begins at Dkt. No. 16, CM/ECF p.21.

[3] Plaintiff had one hearing on the August 9th incident, and two hearings (an original and rehearing) on the August 11th incident.  He alleges due process violations as to all hearings.

[4] Plaintiff's description of the August 9th incident is contained in AC2. The court also notes that, in his amended complaint, plaintiff has made a typographical error in the date of the August 9th incident. (AC2 ¶ 18).  He states that the incident occurred on August 19, 2016, but it is undisputed that the incident to which he refers happened on August 9th.

order to perform the evaluation, plaintiff was sent to Great Meadow Correctional Facility ("GMCF") and was admitted to the Residential Crisis Treatment Program ("RCTP"). (AC2 ¶¶ 18-20). Plaintiff states that he was escorted to the RCTP by defendants Renaud, Drew, Scuderi, Morin, Swan, and Scarlotta. (AC2 ¶ 21). Plaintiff claims that he was told that he would have to submit to a strip frisk, even though he had already undergone such a frisk at Coxsackie before he was transferred to GMCF. (*Id.*) Plaintiff states that he tried to explain to the defendants that he had already been subjected to a strip frisk that day and had been under constant supervision since that time, so it would be unnecessary to do it again. (AC2 ¶¶ 22-23).

Plaintiff claims that he was told that if he did not willingly comply, he would be forced to do so, and that he should "shut up." (AC2 ¶¶ 24-26). Plaintiff states that he was then asked whether he would comply, but because he had been told to "shut up," he did not respond to the inquiry. (AC2 ¶ 26). Plaintiff states that defendants continued to ask him, but when he refused to answer,[5] one of the defendants stated that this "guy really has a death wish," and defendant Scarlotta told the officers to "do him."[6] (AC ¶¶ 27-28).

Plaintiff claims that he was then grabbed by the back of the neck and pulled toward the ground by defendants Renaud, Drew, Swan, Morin, and Scuderi. (AC2 ¶ 29). Plaintiff describes the assault, claiming that after he was "brought down hard

---

[5] Plaintiff states that he refused to answer because he felt "disrespected" by the way that defendants had spoken to him, telling him to "shut . . . up," and he believed that "it would be a good idea to remain silent." (AC2 ¶ 26).

[6] Plaintiff believes that this was the signal, giving the defendants "permission" to assault plaintiff.

against the ground," defendant Renaud punched him on the right side of his face, and another officer stomped on his left leg, causing his knee to bang against the ground." (AC2 ¶ 30). Plaintiff claims that defendant Renaud continued to punch him in the face, and when, in an attempt to stop the beating, plaintiff stated that he would comply, defendant Renaud got up off plaintiff by pushing down on plaintiff's head and smashing his boot against the left side of plaintiff's face. (AC2 ¶ 31). Defendant Renaud continued to "stomp" hard enough for plaintiff's face to hit the ground and "split open on the right side." (*Id.*)

Plaintiff claims that he tried to feign unconsciousness in the hope that defendants would stop beating him, but defendant Renaud continued to press his boot into plaintiff's face. (AC2 ¶ 32). Plaintiff claims that he was then grabbed by his hair, his face was pulled up, and defendant Renaud sprayed pepper spray directly into plaintiff's face from a canister given to him by defendant Scarlotta. (AC2 ¶ 33). Defendant Renaud continued to hit plaintiff in the face until defendant Scarlotta ordered him to stop. (AC2 ¶ 34). Defendant Scarlotta then ordered defendant Scuderi to go and get the use of force camcorder. (AC ¶ 35). However, before the defendants started filming, they wiped off plaintiff's face "aggressively" with a towel, removing evidence of blood and pepper spray. (AC ¶ 36). Plaintiff was then taken to the infirmary, where he was evaluated by Nurse Watkins, who documented his injuries. (AC2 ¶ 37). He states that he was then photographed, and "decontaminated" before being placed in an observation cell. (AC ¶ 38).

Plaintiff claims that he was not given proper treatment for his injuries and had to

be taken back to the infirmary the next day. (AC2 ¶ 39). He states that he complained of headaches, and he tried to show the nursing staff where his hair had been pulled from the roots, but he was instructed to fill out another sick call slip because he was only in the infirmary to get additional sutures. He was never given any pain medication and was "ignored" when he complained of back pain, knee pain, trouble breathing, and earaches. (AC2 ¶ 39). Plaintiff seems to allege that the subsequent medical reports failed to document the true extent of his injuries to "cover up" the seriousness of the assault. (AC2 ¶ 40).

As a result of the August 9th incident, plaintiff states that he was given a misbehavior report, charging him with assault, violent conduct, refusing a direct order, and violation of frisk procedures. He was placed in the GMCF special housing unit ("SHU") as soon as he was released from the RCTP. (AC2 ¶ 41-42). Plaintiff had a hearing regarding these charges which began on August 22, 2016 and concluded on September 16, 2016,[7] with defendant Susan Peacock[8] as the hearing officer. (AC2 ¶ 44).

Plaintiff alleges that defendant Peacock violated his due process rights when she refused to call certain witnesses and provide him with other "material documentation." (AC2 ¶ 44). On September 16, 2016, plaintiff was found guilty of all of the charges, and he was sentenced to 365 days in SHU in addition to loss of privileges.[9] (Peacock

---

[7] The misbehavior reports from both August 9th and August 11th were heard together by defendant Peacock.

[8] In the amended complaint, this defendant is known as "Jane Doe." (AC2 ¶ 44). She has been identified as Susan Peacock and is one of the defendants moving for summary judgment.

[9] The SHU portion of the sanctions was to begin August 9, 2016, and the loss of privileges was to begin on August 10th. (Peacock Decl. ¶¶ 13, 14; Rodriguez Dec. Ex. A at p. 23).

Decl. ¶¶ 13, 14 (Dkt. No. 62-3); Declaration of Anthony Rodriguez, Acting Director of Special Housing/Inmate Disciplinary Programs Ex. A at p. 23).

Plaintiff appealed the determination. (Rodriguez Dec. at ¶ 8; Ex. A at pp. 13-21). On December 1, 2016, defendant Venettozzi reduced the SHU confinement sentence to 270 days. (Rodriguez Decl. ¶ 9; Ex. A at pp. 11, 12).  Plaintiff submitted a request for reconsideration dated December 29, 2016.[10] (Rodriguez Decl. ¶ 10; Ex. A at pp. 4-10). On January 18, 2017, Defendant Venettozzi reversed the disciplinary determination, vacating the penalties imposed, including the SHU confinement, and ordering a rehearing for both misbehavior reports. (Rodriguez Decl. ¶ 11; Ex. A at pp. 1-3). The rehearing on the August 9th incident was never completed, and the charges against plaintiff with respect to that incident were administratively dismissed, and plaintiff's records were expunged. (Rodriguez Decl. ¶ 12; Ex. B).  Plaintiff served only 80 days of the SHU confinement associated with the August 9th incident before the charges were reversed.[11] (Rodriguez Decl.  ¶¶ 13-17).

The defendants' description of the events of August 9th is quite different from the plaintiff's.  The individual defendants who were involved in both the August 9th and August 11th use of force incidents have not filed separate declarations.  Instead, the

_____

[10] The request was submitted by Prisoners' Legal Services on plaintiff's behalf and made various arguments in support of reversal of the charges relating to both the August 9 and the August 11 incidents. (Rodriguez Decl. Ex. A at pp.6-9).

[11] Plaintiff did not begin serving his SHU time until August 17th, when he was released from the RCTP observation (Rodriguez Decl. ¶ 15; Ex. C (inmate movement records)) and served until November 5, 2016, when he received another Tier III misbehavior report, unrelated to the incidents in this complaint, and for which he began serving SHU time on November 5, 2016. (Rodriguez Decl. ¶ 16).

declaration of Anthony Rodriguez contains copies of the disciplinary hearing transcripts, officers' memoranda, and incident reports from the August 9th and the August 11th incidents, which were considered during plaintiff's disciplinary hearings. (Rodriguez Decl. & Exhibits A-G) (Dkt. No. 62-6). Defendants have also submitted the transcripts of confidential testimony taken at plaintiff's disciplinary hearings, which the court has reviewed in-camera. (Hummel Decl. ¶¶ 5, 7, 9 & Exs. C, E, G).

The reports, including the unusual incident report, and the subsequent investigative report, written by Lieutenant P. Zarnetski, indicate that defendant Renaud was conducting an admission strip frisk of the plaintiff, supervised by Sergeant Scarlotta. (Rodriguez Decl. Ex. A at pp. 30, 44). Plaintiff was ordered to bend at the waist and allow the officer to examine his anus. Defendant Scarlotta gave plaintiff several orders to comply, but he refused to do so. Defendant Scarlotta told the plaintiff to put his hands back on the wall, but instead, plaintiff turned to the left and struck defendant Renaud with a closed fist to the left side of the defendant's mouth. (Rodriguez Decl. Ex. A at p. 46) (Renaud Use-of-Force Memorandum).

Defendant Scarlotta delivered a one-second burst of pepper spray to plaintiff's face, but this did not stop plaintiff, and he advanced toward defendant Renaud, pushing him into the shower area with both hands. (Rodriguez Decl. Ex. A at p. 45) (Scarlotta Report). After plaintiff pushed defendant Renaud into the shower area, defendant Renaud gave plaintiff several orders to go to the floor, but plaintiff refused. (Rodriguez Decl. Ex. A at p. 47). Defendant Renaud pushed back at plaintiff, and additional staff responded and assisted by using body holds to get plaintiff to the ground. (Rodriguez

7

Decl. Ex. A at p. 47) (Renaud Report).  Defendant Drew responded from outside the observation room. (Rodriguez Decl. Ex. A at p. 48-49) (Drew Report).  Once plaintiff was secured on the floor, defendant Renaud was able to grab plaintiff's wrists and apply mechanical restraints, at which time, plaintiff became compliant. (Rodriguez Decl. Ex. A at p. 47).  Plaintiff was taken to the infirmary, where Nurse Watkins found two one-inch superficial cuts to plaintiff's right lateral brow; abrasions to the left side of his neck; "quarter size" abrasions on the right side of his neck; red eyes; and a one-inch cut on the inside of his right cheek. (Rodriguez Decl. Ex. A at p. 50) (Nurse Watkins Report).  Plaintiff's face was washed with soap and water, and "steri-strips" were applied to one of the cuts on his right brow. (*Id.*)

### 2. August 11, 2016

Two days later, plaintiff claims that defendant Prieur was making morning rounds of the RCTP. (AC1 ¶ 17).  Defendant Prieur stopped at plaintiff's cell and noticed that plaintiff was not fully dressed in his smock.  The smock was folded and just covering the plaintiff. (*Id.*)  Plaintiff claims that defendant Prieur ordered him to "get dressed properly." (*Id.*)  Plaintiff tried to explain that he was hot, and that defendant Prieur should "just leave [him] alone" because he was working through the death of his grandmother and other issues. (AC1 ¶ 18).  Defendant Prieur then ordered plaintiff to get dressed because there would be females on the unit distributing medication, but plaintiff argued that he was not getting medication, so it would not be a problem.  Plaintiff states that, when he got up and approached the door of the cell, further words were exchanged, and defendant Prieur ultimately remarked that plaintiff

must not have learned his lesson from getting his "ass kicked" the other day. (AC1 ¶ 20).

The argument between defendant Prieur and plaintiff continued, (AC1 ¶¶ 21-24), with plaintiff telling defendant Prieur that "defendant could do whatever he planned to do to him because [plaintiff] was not worried about the defendant or others . . . ." (AC1 ¶ 23). Plaintiff ultimately swore at defendant Prieur and went back to his bed. (AC1 ¶ 24). Plaintiff claims that defendant Prieur then had a "side conversation" with defendant Vandenburg, who had been sitting in front of plaintiff's cell during the argument. (*Id.*)

Later, defendant Prieur came back to plaintiff's cell with defendant Rose to escort plaintiff to his mental health appointment. (AC1 ¶ 26). Plaintiff claims that an inmate in a neighboring cell told plaintiff that he should not go with the defendants because it was likely he would be assaulted, to which plaintiff responded that he did not care, and that he would "take the beating for all the inmates [who] were previously assaulted and could not defend themselves through the grievance or other litigation processes." (AC1 ¶ 28).

As plaintiff was talking to his neighbor, defendant Rose told plaintiff to come to the cell door so that he could apply the mechanical restraints prior to the escort. (AC1 ¶ 29). Plaintiff complied, and the cell door was opened. Plaintiff claims that defendant Rose instructed him to come out of the cell backwards, and as he did so, he was viciously punched in the side of the face, causing him to stumble backwards into defendant Rose and into the cell door while he continued to have punches thrown at

him in rapid succession by defendant Prieur as defendant Rose held on to the waist

chain. (AC1 ¶ 30).  Plaintiff fell to the floor against the rear wall of the hallway. (*Id.*)

Plaintiff claims that defendant Prieur continued to punch plaintiff in the face as he was

leaning against the wall, and when other guards responded to the area, defendant Rose

yelled that plaintiff had kicked defendant Prieur. (AC1 ¶ 32).

Plaintiff was picked up off the floor and claims that he tried to explain that he

had done no such thing, but was told to shut up as they placed him against the wall.

(AC1 ¶ 33).  Plaintiff claims that he was again sprayed with pepper spray, and shackles

were placed tightly around his ankles. (AC1 ¶ 34).  Plaintiff claims that the "Sgt." told

someone to get the use-of-force camera, but asked if anyone wanted to get some more

punches in first.  The other officers declined the opportunity. (AC1 ¶ 35).

Plaintiff states that he became agitated and needed to calm down prior to being

escorted to the infirmary. (AC1 ¶ 38).  When plaintiff was finally taken to the infirmary,

he was examined by defendant Physician Assistant ("PA") Nesmith. (AC1 ¶ 39).

Plaintiff claims that defendant Nesmith did not document all of the plaintiff's "clearly

evident injuries," in an effort to downplay the severity of the incident and protect the

other defendants. (AC1 ¶¶ 39-40).  Plaintiff claims that he was never given any aspirin

or pain medication, even though he complained of jaw pain, headaches, and difficulty

breathing through his nose. (*Id.*)

Plaintiff received a misbehavior report after the August 11th incident, charging

him with violent conduct, disobeying a direct order, creating a disturbance,

interference, and a "movement" violation. (AC1 ¶ 41).  The disciplinary hearing for the

August 11th incident was commenced on August 22, 2016, the same day as the hearing on the August 9th charges and also heard by defendant Peacock. (Rodriguez Decl. Ex. E at p. 19). On September 16, 2016, plaintiff was found guilty of all of the charges, and he was sentenced to 365 days in SHU in addition to loss of privileges for the August 11th incident. (Peacock Decl. ¶¶ 23; 24; Rodriguez Dec. Ex. E at p. 19). The sanctions for the August 11th incident were scheduled to begin in August **2017**. upon the expiration of the sanctions imposed after the hearing concerning the August 9, 2016 incident. (*Id.*)

Plaintiff appealed the determination. (Rodriguez Decl. ¶ 21; Ex. E at pp. 12-18). On December 1, 2016, defendant Venettozzi reduced the SHU confinement sentence to 270 days. (Rodriguez Decl. ¶ 22; Ex. E at pp. 10, 11). The December 29, 2016 letter written on plaintiff's behalf by Prisoner's Legal Services requested reconsideration of the hearing disposition for both the August 9 and the August 11 incidents. (Rodriguez Decl. ¶ 23; Ex. E. at pp. 4-9). On January 18, 2017, Defendant Venettozzi, reversed the disciplinary hearing determination, vacated the penalties, including the SHU confinement, and ordered a rehearing. (Rodriguez Decl. ¶ 24; Ex. E at pp. 1-3) (relative to the August 11th incident).

The rehearing of the August 11th incident began on January 31, 2017 before Hearing Officer Henley at GMCF.[12] (Rodriguez Decl. Ex. G at p. 38). Plaintiff was transferred to Southport Correctional Facility on February 17, 2017 (Rodriguez Decl.

---

[12] Officer Henley is not a defendant, and it appears that the bulk of the rehearing on the August 11th incident was conducted by defendant Wagner in May of 2017, after plaintiff's transfer to Southport. (Rodriguez Decl. Ex. G at 38).

Ex. F), and the hearing was completed on May 20, 2017 by defendant Hearing Officer Bart Wagner. (Rodriguez Decl. Ex. G at p. 38).  On May 20, 2017, defendant Wagner found Plaintiff guilty of four of the six disciplinary charges and imposed sanctions of 270 days SHU confinement and loss of packages, commissary, and phone privileges, and six months loss of good time. (Wagner Decl. ¶¶ 9, 10 (Dkt. No. 62-4); Rodriguez Decl. Ex. G. at p. 38).  Because Plaintiff was already serving SHU time for a different disciplinary infraction, his SHU confinement time was scheduled to begin November 5, 2017 and continue through August 2, 2018. (*Id*.) The other sanctions began on September 10, 2017. (*Id.*)

Plaintiff filed an appeal of the re-hearing determination. (Rodriguez Decl. ¶ 30; Ex. G at pp. 7-36). On July 20, 2017, defendant Venettozzi reduced the sanctions, including the SHU confinement, to 140 days with 40 days suspended, and reduced the loss of good time to three months.[13] (Rodriguez Decl. ¶ 31; Ex. G at pp. 3-4).

The defendants' description of the August 11th incident is quite different from the plaintiff's description.  The disciplinary hearing packets for both the original hearing and the rehearing of the August 11 incident are included as part of the Rodriguez Declaration.[14]  The Unusual Incident Report ("UI") states that, at approximately 10:10 a.m. on August 11, 2016, defendant Rose was scheduled to escort the plaintiff to an

---

[13] A subsequently letter of appeal or reconsideration was submitted by Prisoner's Legal Services, resulting in a further reduction of the sentence, including no loss of good time. (Rodriguez Decl. Ex. G at 2).

[14] The hearing packets contain, inter alia, the officers' written statements and administrative documents. (Rodriguez Decl. Exs. A, E, G).  The hearing transcripts are attached to the Hummel Declaration. (Hummel Decl. Exs. B-G) (which include the confidential in-camera testimony - Exs. C, E, G).

OMH "call-out." (Rodriguez Ex. G at p. 54).  Defendant Prieur was present. (*Id.*)  In preparation for the escort, handcuffs were applied, and plaintiff backed out of his cell. (*Id.*)  Plaintiff turned to his right and kicked defendant Prieur in the groin. (*Id.*) Defendants Prieur and Rose forced plaintiff face-first into the cell front, and then used body holds to force plaintiff to the floor. (*Id.*)

The plaintiff was brought under control[15] and taken back into the cell, where he was examined by defendant Nesmith, who ordered that plaintiff be taken back to the infirmary for further evaluation. (*Id.*)  Sergeant Mulligan and Officer Monahan escorted plaintiff to the infirmary with Officer Rovelli operating the video camera. (*Id.*)  At the infirmary, PA Nesmith examined plaintiff and found a minor contusion to his upper left arm and dried blood in his nostrils. (*Id.*)  Plaintiff was moved to a cell for observation. (*Id.*)

## II.  **Summary Judgment**

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006).  Rule 56(b) provides that a party may file a motion for summary judgment "at any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b). Thus, a party may move for summary judgment in lieu of an answer. *See, e.g., Anderson v.*

---

[15] The disciplinary packet contains a report by Sergeant Shattuck, who states that after the force had ceased, Officer Hanlon responded to the area, and Sergeant Shattuck ordered Officer Hanlon to place mechanical restraints on plaintiff's legs "as a precaution." (Rodriguez Ex. G at p. 58). The officers who were involved in the use of force were relieved of duty so that they could go to the infirmary to be examined for injuries. (*Id.*)

*Rochester-Genesee Reg'l Transp. Auth.*, 337 F.3d 201, 202 (2d Cir. 2003); *Crenshaw v. Syed*, 686 F. Supp. 2d 234, 236 (W.D.N.Y. 2010); *Riehl v. Martin*, No. 9:13-CV-439 (GLS/TWD), 2014 WL 1289601, at *1-2 (N.D.N.Y. Mar. 31, 2014).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272. "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

While courts are required to give due deference to a plaintiff's pro se status, that status "does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46,

50 (2d Cir. 2003). Additionally, where, as here, a party has failed to respond to the movant's statement of material facts as required by Local Rule 7.1(a)(3), the facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record, and (2) the non-movant, if proceeding pro se, has been specifically advised of the possible consequences of failing to respond to the motion.[16] *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996); see also N.D.N.Y. Local Rule 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers . . . shall be deemed as consent to the granting or denial of the motion[.]").

## III. **Exhaustion of Administrative Remedies**

### A. **Legal Standards**

The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. §1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004), (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002)), abrogated on other grounds by *Ross v. Blake*, 578 U.S. 632 (2016). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

---

[16]In this case, defendant in his moving papers specifically advised plaintiff of the consequences of failing to respond to the summary judgment motion. (Dkt. No. 62 at 3).

In order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones v. Bock*, 549 U.S. 199, 218-19 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. *Woodford,* 548 U.S. at 90-103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Incarcerated[17] Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id*. § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id*. § 701.5(d). The court also notes that the regulations governing the Incarcerated[18] Grievance Program ("IGP") encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility). There is also a special section for complaints of harassment. *Id*. § 701.8. Complaints of harassment are handled by an expedited procedure which provides that such grievances are

---

[17] This committee was formerly known as the "Inmate Grievance Resolution Committee," but has recently been renamed.

[18] The program was formerly known as the "Inmate Grievance Program," but has recently been renamed.

forwarded directly to the Superintendent of the facility, after which the inmate must appeal any negative determination to the CORC. *Id.* §§ 701.8(h) & (I), 701.5.

Prior to *Ross v. Blake, supra*, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

In *Ross*, the Supreme Court made it clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross*, 578 U.S. at 640. "'[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.'" *Riles v. Buchanan*, 656 F. App'x 577, 580 (2d Cir. 2016) (quoting *Ross*, 578 U.S. at 639). Although *Ross* has eliminated the "special circumstances" exception, the other two factors in *Hemphill* – availability and estoppel – are still valid. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross*, 578 U.S. at 642. Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id; see also Riles*, 2016 WL 4572321 at *2.

17

### B.    Analysis

Defendants argue that plaintiff has failed to exhaust his administrative remedies as to the excessive force and medical care claims for both the August 9 and the August 11 incidents.  Defendants argue that plaintiff never filed any grievance alleging excessive force or lack of proper medical care on August 11, 2016.  They also argue that, although plaintiff filed a grievance alleging that he was subjected to excessive force/assault on August 9, 2016 (GM-61309-16), the grievance did not include claims relating to his subsequent medical care on that date, and he did not appeal the denial of the excessive force grievance to the CORC.  Defendants rely upon the declarations of Alexandria Cutler, the IGP Supervisor at GMCF and Rachael Seguin, the Assistant Director of the IGP for DOCCS. (Cutler Decl. & Seguin Decl.) (Dkt. Nos. 62-8, 62-9).

It seems clear from these two declarations and the documents attached as exhibits, that plaintiff did not "file" a grievance relative to the August 11 incident or the medical care portion of the August 9th incident and did not "file" an appeal of the denial of the grievance relative to the August 9th use of force. (Cutler Decl. ¶ 13-16, 18; Seguin Decl. ¶ 17).  The grievance relating to the August 9th use of force is dated September 12, 2016. (Cutler Decl. ¶ 13 & Ex. A).  Because the grievance alleged assault by staff it was given "Code 49," and it was immediately forwarded to the Superintendent for investigation. (Cutler Decl. ¶ 14).  On October 26, 2016, the Superintendent issued a decision, denying the grievance subsequent to an investigation conducted by a "designee." (Cutler Decl. ¶ 15 & Ex. A at p.1).

The Superintendent's decision indicates that plaintiff had seven days to file an

18

appeal of the decision with the CORC. (Cutler Decl. ¶ 16 & Ex. A at p.1).  Plaintiff did

not file a timely appeal.  On January 31, 2017, the grievance office received a letter

from plaintiff requesting that he be allowed to file a late appeal.  However, the request

was denied because plaintiff had not demonstrated "sufficient mitigating

circumstances" to warrant such an extension of time. (Cutler Decl. ¶ 17 & Ex. B).

Although plaintiff has not responded to the defendants' motion, a review of the

amended complaint shows that plaintiff has always claimed that the defendants

prevented him from filing grievances or misdirected the grievances that he submitted.

The exhibits to his amended complaint include numerous grievances, regarding both

incidents, that he argues were never filed or somehow misdirected. (Pl.'s Exs.) (Dkt.

No. 19-2).  In fact, in November of 2016, plaintiff filed two grievances, one claiming

that his grievances were not being filed, and the second, that his mail was being

tampered with. (*See* Pl.'s Exs. D, E) (Letters acknowledging receipt of plaintiff's

grievance (No. 61,516-16 and 61,516-15)).

On January 19, 2017, Captain Cleveland wrote a letter to plaintiff, stating that his

claim of mail-tampering had been reviewed, but was found unsubstantiated. (Pl.'s Ex. F

at p.2).  However, on January , 31, 2017, IGP Supervisor A. Kuinlan,[19] wrote a

memorandum to the plaintiff, entitled "review of copies." (Pl.'s Ex. V).  This

memorandum appears to be in response to plaintiff forwarding documents that he

believed should have been sent to the IGRC.  However, in her letter, IGP Supervisor

---

[19] The IGP Supervisor who wrote the defendants' declaration is Alexandra Cutler, and it is
unclear whether these two individuals are the same.  IGP Supervisor Cutler refers to Alexandra
Kuinlan in the third person, so the court will not make any assumptions. (*See* Cutler Decl. ¶ 17).

Kuinlan states that the documents were forwarded "to security personnel, not the IGRC . . . ." (*Id.*)  Although it is unclear what plaintiff sent to IGP Supervisor Kuinlan, the allegedly unfiled grievances and letters that plaintiff attaches as exhibits to the amended are addressed to the IGRC.[20] (*See* Pl.'s Exs. B, C, G-L, N-P, U).  Plaintiff also wrote letters directly to the CORC. (Pl.'s Exs. M, Q, T).  Thus, IGP Supervisor Kuinlan's statement that plaintiff's documents were instead forwarded to "security personnel" is unclear.  Plaintiff also wrote two letters to Karen Bellamy, Director of the IGP for DOCCS. (Pl.'s Exs. R, S).

Plaintiff does not dispute that he failed to exhaust his administrative remedies.  Rather, he appears to claim in the amended complaint that the defendants prevented him from doing so by misdirecting or tampering with his grievances.  Defendants do not address these assertions in any way, simply arguing that the failure to file a grievance or to appeal the denial of a grievance is sufficient for dismissal.  However, as stated above, estoppel based upon defendants' conduct is still a valid basis for the court to excuse the exhaustion requirement.  Notwithstanding plaintiff's failure to respond to the motion, defendants have not established that there is no genuine issue of material fact as to whether the grievance process was available to plaintiff.  Thus, the court will not recommend dismissing the excessive force and denial of medical care claims for failure to exhaust, leaving the issue for resolution through an evidentiary hearing if appropriate.  The court will proceed to consider the claims that defendants argue also

---

[20] Plaintiff's exhibits are 100 pages long, and it is unclear why the defendants did not address the obvious claim that the plaintiff is attempting to make regarding his multiple attempts at resolving his grievance issues.

fail on the merits (medical care and due process).[21]

## IV.    <u>Medical Care</u>

### A.    Legal Standards

In order to state a claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing *inter alia Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

#### 1.    Objective Element

There is a two part inquiry to determine whether an alleged deprivation is "objectively serious." *Benjamin v. Pillai,* 794 F. App'x 8, 11 (2d Cir. 2019) (citing *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006)). The first question is whether the plaintiff was actually deprived of adequate medical care. *Id.* Prison officials who act "reasonably" in response to the inmates health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care." *Salahuddin*, 467 F.3d at 279-80 (citing *Farmer v. Brennan*, 511 U.S. 825, 844-47 (1994)).

The second part of the objective test asks whether the purported inadequacy in

---

[21] Defendants do not argue that the plaintiff's claims of excessive force fail on the merits.

the medical care is "sufficiently serious." *Benjamin v. Pillai*, 794 F. App'x at 11 (citing *Salahuddin*, 467 F.3d at 280).  The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff.  *Salahuddin*, 467 F.3d at 280 (citing *Helling v. McKinney*, 509 U.S. 25, 32-33 (1993)).  If the "unreasonable care" consists of a failure to provide ***any*** treatment, then the court examines whether the inmate's condition itself is "sufficiently serious."  *Id.* (citing *Smith*, 316 F.3d at 185-86).  However, in cases where the inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower.  *Id.*  If the issue is an unreasonable delay or interruption of ongoing treatment, then the "seriousness" inquiry focuses on the challenged delay itself, rather than on the underlying condition alone.  *Benjamin v. Pillai*, 794 F. App'x at 11.  The court in *Benjamin* reiterated that although courts speak of a "serious medical condition" as the basis for a constitutional claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability. *Benjamin*, 794 F. App'x at 11 (citing *Smith*, 316 F.3d at 185).

### 2.    Subjective Element

The second element is subjective and asks whether the official acted with "a sufficiently culpable state of mind." *Benjamin*, at 11 (citing *Hathaway v. Coughlin*, 511 U.S. 825, 553 (2d Cir. 1996)).  In order to meet the second element, plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care. *Salahuddin*, 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 835-37).  Instead, plaintiff

must show that the defendant was "deliberately indifferent" to that serious medical condition, *i.e.*, that the charged official possessed "'a state of mind that is the equivalent of criminal recklessness.'" *Benjamin* at 11, (quoting Hathaway, 99 F.3d at 553).

In order to rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety. *Abreu v. Lipka*, 778 F. App'x 28, 32 (2d Cir. 2019) (quoting *Smith*, 316 F.3d at 184). The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must draw that inference. *Chance*, 143 F.3d at 702 (quoting *Farmer*, 511 U.S. at 837). The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer*, 511 U.S. at 844. The court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin*, 467 F.3d at 281.

Additionally, a plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Riddick v. Maurer*, 730 F. App'x 34, 38 (2d Cir. 2018) (quoting *Chance*, 143 F.3d at 703). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Sonds v. St. Barnabas Hosp. Correctional Health Services*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001) (citations omitted). An inmate does not have the right to treatment of his choice.

*Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986).  Because plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation.  *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment.  *Sonds*, 151 F. Supp. 2d at 312 (citing *Estelle v. Gamble*, 429 U.S. at 107).  Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate.  *Id.; see also Daniels v. Williams*, 474 U.S. 327, 332 (1986) (noting that negligence is not actionable under § 1983).  Thus, any claims of malpractice, or disagreement with treatment are not actionable under § 1983.

**B.    Analysis**

The only remaining medical care claims are against defendant PA Nesmith and Nurse John Doe for the care that plaintiff received after the August 11, 2016 incident.[22] Nurse John Doe has never been identified or served in this action.  At this time, any attempt to name the defendant would likely be barred by the three-year statute of limitations.  "John Doe pleadings generally 'cannot be used to circumvent statutes of limitations because replacing a 'John Doe' with a named party in effect constitutes a change in the party sued.'"  *See Barrow v. Wethersfield Police Dep't*, 66 F.3d 466, 468 (2d Cir. 1995) (quoting *Aslanidis v. United States Lines, Inc*., 7 F.3d 1067, 1075 (2d

---

[22] The medical care claims against defendant Watkins for the care she provided plaintiff after the August 9th incident were dismissed without prejudice by Judge Hurd's order dated June 19, 2019. (Dkt. No. 5 at 20, 34).  Although the claims were dismissed with leave to amend, plaintiff has failed to do so.

Cir. 1993)).  In any event, plaintiff in this case never really describes how the unnamed defendant's care was constitutionally inadequate,[23] and the court will recommend dismissing the action as against the unidentified and unserved defendant.

Plaintiff claims that defendant Nesmith's report noted only a minor contusion to plaintiff's left upper arm and dried blood in his nostril, but did not document the "other clearly evident injuries" to his face and forehead. (AC1 ¶ 39).  Defendant Nesmith has submitted a declaration, together with plaintiff's medical records which were generated after the August 11th incident. (Nesmith Decl. & Ex. A) (Dkt. No. 63).  Defendant Nesmith states that, at 10:25 a.m. on August 11, 2016, he evaluated plaintiff after the use-of-force incident. (Nesmith Decl. ¶ 4 & Ex. A).  He observed the minor contusion on plaintiff's arm and the dried blood around plaintiff's nose.  In addition, he noted that plaintiff was very agitated and uncooperative. (*Id.*)  Defendant Nesmith had the dried blood cleaned and determined that no further care was necessary for the contusion to plaintiff's upper left arm. (*Id.*)  Based upon plaintiff's mental health condition, in general, and his agitated state, defendant Nesmith directed that plaintiff have a mental health consultation.  Plaintiff was seen by the psychiatrist, Dr. Pal, in the facility hospital. (*Id.*)

Defendant Nesmith also ordered x-rays of plaintiff's facial bones to rule out any fractures or breaks. The records indicate that plaintiff was initially uncooperative with staff for an escort to the medical unit so that x-rays could be taken, but he eventually cooperated with staff.  X-rays showed no fractures or breaks. (*Id.*)

---

[23] The amended complaint focuses on the alleged deficiency in the care provided by defendant Nesmith. (AC1 ¶¶ 39, 40).

Although plaintiff claims that defendant Nesmith ignored "obvious" other injuries, defendant Nesmith notes in his declaration that plaintiff had been subjected to a use-of-force on August 9, and to the extent that the plaintiff's injuries from August 9th had already been documented, defendant Nesmith did not believe that it was necessary to repeat them. (Nesmith Decl. ¶ 5).  Defendant Nesmith recorded only the "new" injuries that plaintiff received after the August 11th use-of-force. (*Id.*)  Defendant Nesmith determined that the August 9th injuries had not been disturbed by the August 11th incident and therefore, should not be recorded as "new" injuries. (*Id.*)

Plaintiff has not responded to the defendants' summary judgment motion, nor did he elaborate on the "obvious" other injuries that defendant Nesmith allegedly failed to document.[24]  Plaintiff states that he was not given "aspirin" or "any pain medication." (AC1 ¶ 40).  Defendant Nesmith states that it was his medical opinion that no such medication was necessary. (Nesmith Decl. ¶ 6).

A minor contusion to plaintiff's arm and a bloody nose are not the kind of injuries that would be considered "sufficiently serious" to meet the objective prong. *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 354 (N.D.N.Y. 2010) (finding two bruises and a superficial laceration "not significant enough to satisfy the objective element.") At his deposition, plaintiff conceded that he received the care for his injuries that defendant Nesmith described in his declaration and in his records. (Hummel Decl. Ex. A ("Randolph Dep.") at 75-79)  Plaintiff claimed that he did not receive the care that he believed was appropriate, and that defendant "downplayed" his injuries.  However,

---

[24] Plaintiff states only that he complained of "jaw pain," "headaches," and difficulty breathing out of his nose. (AC1 ¶ 40).

other than stating that he complained of additional pain, he never explained how he believed that his injuries were "downplayed" to protect the other defendants.  Plaintiff's x-rays were negative for any broken bones, and defendant Nesmith has explained that he did not restate the injuries for which plaintiff received care on August 9th.

During plaintiff's deposition, he did not elaborate on any additional injuries, and stated that the "emotional effects" of the use-of-force lasted longer than any physical injuries.[25] (*Id.*)  Plaintiff stated that

> And he didn't really give me an exam that ***I thought*** a doctor
> who was hearing from someone who had just been brutally
> assaulted, would give them, you know what I mean, like he
> was just, he was -- he was acting indifferent. . . .
> like, it was more his attitude, if he had changed his attitude
> and showed a little concerned, compassion, like that, it would
> have been different. But he -- he really, he had like, his . . .
> disposition was just ugly. It was -- it was nasty.

(Randolph Dep. at 80, 81) (emphasis added).  Now that plaintiff has failed to respond to verified and documented medical evidence, there are no questions of fact that would prevent the court from granting defendant Nesmith's motion for summary judgment.

Plaintiff's dislike of defendant Nesmith's "attitude" or his desire for pain medication that defendant Nesmith did not believe was appropriate does not rise to the

---

[25] In fact, when asked about a cut on his lip, he stated it was a "small little gash [on] the inside. It wasn't nothing [sic] for anybody to die over of course . . . ." (Randolph Dep. at 83).  In *Johnson v. Wright*, 412 F.3d 398, 403 (2d Cir.2005), the Second Circuit stated that "[t]o establish deliberate indifference to his serious medical needs, a inmate must establish (1) a medical need constituting 'a condition of urgency' that might result in 'death, degeneration, or extreme pain,' and (2) defendant's knowledge and disregard of 'an excessive risk to [the inmate's] health or safety.'" (internal quotation marks omitted).  Plaintiff's casual statement at his deposition shows that his injuries were not of that nature.  The court also notes that the cut inside of plaintiff's cheek was documented after the August 9th incident.

level of deliberate indifference to plaintiff's serious medical needs. *See Wheeler-Whichard v. Doe*, No. No. 10-CV-358(S), 2010 WL 3395288, at *4 (W.D.N.Y. August 25, 2010) (rudeness does not rise to the level of deliberate indifference). Therefore, the entire amended complaint may be dismissed as against defendant Nesmith.

**V.    Due Process (Defendants Peacock, Wagner, and Venettozzi)**

    **A.    Legal Standards**

To begin a due process analysis relating to prison disciplinary proceedings, the court must determine whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges, and then determine whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001). In *Sandin v. Conner*, 515 U.S. 472, 484 (1995), the Supreme Court held that although states may create liberty interests for inmates that are protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force . . . , nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."

The Second Circuit has explicitly avoided a bright line rule that a certain period of confinement in keeplock or a segregated housing unit automatically gives rise to due process protection. *See Sims v. Artuz*, 230 F.3d 14, 23 (2d Cir. 2000); *Colon v. Howard*, 215 F.3d 227, 234 (2d Cir. 2000). Instead, cases in this circuit have created guidelines for use by district courts in determining whether a prisoner's liberty interest

was infringed. *Palmer v. Richards*, 364 F.3d 60, 64-66 (2d Cir. 2004).

A confinement longer than an intermediate one, and under "normal SHU conditions" is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*." *Colon*, 215 F.3d at 231 (finding that a prisoner's liberty interest was infringed by 305-day confinement). "Where the plaintiff was confined for an intermediate duration–between 101 and 305 days– . . . a district court must "make a fact-intensive inquiry," . . . examining "the actual circumstances of SHU confinement" in the case before it . . . ." *Palmer v. Richards*, 364 F.3d at 64-65 (citations omitted). Shorter confinements under normal SHU conditions may not implicate a prisoner's liberty interest. However, "SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions . . . or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer v. Richards*, 364 F.3d at 65 (citations omitted).

The due process protections afforded inmates facing disciplinary hearings that are found to affect a liberty interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (*citing, inter alia, Wolff v. McDonnell*, 418 U.S. 539, 563-67 (1974)). The hearing officer's findings must be supported by "some" "reliable

evidence." *Id.* (*citing, inter alia, Superintendent v. Hill*, 472 U.S. 445, 455 (1985)).

**B.    Analysis**

    **1.    August 11th Incident (Defendant Peacock - September 16, 2016)**

As defendants point out, plaintiff never served any of the SHU confinement that

was imposed as the result of the hearing held by defendant Peacock relative to the

August 11, 2016 incident.  Plaintiff's term of SHU confinement for the August 11th

incident was set to begin on August 9, **2017**, the date that his SHU confinement for the

August 9th incident expired. (Rodriguez Decl. ¶¶ 24-25).  Defendant Venettozzi

reversed defendant Peacock's determination of the August 11, 2016 charges on January

18, 2017.[26] (Rodriguez Decl. ¶ 24 & Ex. E at 1-3).  He ordered a rehearing within 14

days, and ordered the expungement of all the records relating to the reversed hearing.

(*Id.*)  There is no liberty interest created, and therefore, no due process violation if the

disciplinary determination is reversed prior to the plaintiff serving ***any*** of the

confinement imposed as a result of the hearing. *Allah v. Ryan*, 436 F. Supp. 3d 621, 630

(W.D.N.Y. 2020); *Abreu v. Farley*, No. 6:11-CV-6251 (EAW), 2019 WL 1230778, at

*6 (W.D.N.Y. March 15, 2019).  Thus, the due process claims against defendant

Peacock for the plaintiff's first disciplinary hearing relative to the August 11th incident

may be dismissed.  Plaintiff was transferred out of GMCF in February of 2017, and the

rehearing was held by defendant Wagner at Southport Correctional Facility. (Wagner

Decl.) (Dkt. No. 62-4).

---

[26] Defendant Venettozzi's basis for reversal was that defendant Peacock improperly removed
plaintiff from the hearing. (Rodriguez Decl. Ex. E at 2).

### 2. August 9th Incident (Defendant Peacock - September 16, 2016)

As stated above, plaintiff served 80 of the 365 day SHU sentence relative to the hearing on the August 9th incident before defendant Venettozzi reversed the determination and ordered a rehearing.[27]  Eighty days is less than the minimum 101 days, generally regarded as potentially implicating a liberty interest.  The plaintiff has failed to respond to the defendants' motion and never argued that the conditions in SHU were different than "normal" SHU conditions.  In the absence of disputed facts regarding the conditions of confinement, summary judgment may be issued "'as a matter of law.'" *Caimite v. Rodriguez*, No. 9:17-CV-0919 (GLS/CFH), 2020 WL 6530780, at *5 (N.D.N.Y. Apr. 9, 2020) (quoting *Palmer v. Richards*, 364 F.3d 60, 65 (2d Cir. 2004), *questioned on other grounds*, *Pearson v. Callahan*, 555 U.S. 223 (2009).  Thus, all the due process claims against defendant Peacock may be dismissed based on the lack of a liberty interest, and the entire amended complaint may be dismissed as against this defendant.

### 3. August 11th Incident Rehearing (Defendant Wagner)

The rehearing of the August 11th incident occurred after plaintiff was transferred to Southport, with defendant Bart Wagner, then a Captain at Southport, sitting as the hearing officer. (Wagner Decl. ¶ 1) (Dkt. No. 62-4).  The hearing packet appears as an exhibit to the Rodriguez Declaration, and includes all the documentation relative to the rehearing held by defendant Wagner. (Rodriguez Decl. Ex. G).

---

[27] As stated above, the rehearing on this incident never took place, the charges were dismissed, and any information relative to the hearing was expunged from plaintiff's records.  There is no reference to this incident in plaintiff's disciplinary record.

Plaintiff claims that defendant Wagner denied him the ability to call witnesses and denied him the ability to perform a "physical" demonstration at the rehearing. Plaintiff asked that he be allowed to wear the same "smock" as he was wearing on August 11th and that he be allowed to attempt to kick someone while wearing that smock in an effort to show that it was impossible for him to engage in the conduct of which he was accused.

Defendant Wagner states that plaintiff requested five witnesses, only two of whom agreed to testify, and their testimony was taken by telephone because they were located at different facilities. (Wagner Decl. ¶ 6). Inmates Hale and Moses refused to testify. (Wagner Decl. ¶ 6). Inmate Hale executed a refusal form. (Rodriguez Decl. Ex. G at 51). Inmate Moses refused to testify, but also refused to execute the appropriate form, so one was prepared for him. (Rodriguez Decl. Ex. G at 50). Defendant Wagner states that he attempted to locate Inmate Ector and learn his availability to testify. (Wagner Decl. ¶ 6). However, staff learned that Inmate Ector had been paroled and was, at the time of the rehearing, under the care and custody of the New York State Department of Mental Health in a psychiatric center. (*Id.*)

Staff from Southport contacted Mr. Ector's psychiatrist, who informed them that Mr. Ector was not capable of testifying due to his mental condition, and that testifying would not be in his best interests. (Wagner Decl. ¶ 6; Rodriguez Decl. Ex. G at 84). Defendant Wagner prepared a Form 2176, documenting Mr. Ector's unavailability. (*Id.*) Defendant Wagner states that, in his capacity as a prison disciplinary hearing officer, he had no authority to compel witnesses' testimony. Thus, he was unable, not unwilling to

produce all of the plaintiff's requested witnesses.

Although inmates are entitled to a reasonable opportunity to call witnesses, such opportunity may be limited for security reasons, to keep the hearing within a reasonable time limit, or on the basis of irrelevance or lack of necessity. *Brooks v. Rock*, No. 9:11-CV-1171 (GLS/ATB), 2014 WL 1292232, at *28 (N.D.N.Y. Mar. 28, 2014) (citations omitted). "'[I]f a witness will not testify if called, it cannot be a 'necessity' to call him," and the prison official [who] "reasonably concludes that it would be futile to call a witness to testify" does not violate the inmate's constitutional rights." *Caimite v. Venettozzi*, No. No. 9:17-CV-0919 (GLS/CFH), 2018 WL 6069458, at *5 (N.D.N.Y. Oct. 29, 2018) (quoting *Silva v. Casey*, 992 F.2d 20, 22 (2d Cir. 1993) and citing *Abdur-Raheem v. Caffery*, No. 13-CV-6315 (JPO), 2015 WL 667528, at *6 (S.D.N.Y. Feb. 17, 2015) (citing cases for the proposition that "courts [within this Circuit] have consistently held that a prison hearing officer's failure to call a fellow inmate who refuses to testify does not violate due process.")) In addition, there is no constitutional requirement that the hearing officer make an independent evaluation of the basis for the witness's refusal. *Id.* (quoting *Abdur*, 2015 WL 667528, at *6).

In this case, defendant Wagner called the two witnesses who agreed to testify, and obtained refusal forms from the two witnesses who refused to testify, albeit signed by only one of the witnesses. In addition, defendant Wagner located the plaintiff's final inmate witness, but determined that the witness was not available due to his mental condition. He was not required to investigate further, and was not authorized to "compel" their testimony.

Defendant Wagner also denied plaintiff's request to "recall" certain witnesses who had previously testified. (Hummel Decl. Ex. E at 64). Plaintiff refused to explain what he was going to ask these individuals. He simply claimed that they gave contradictory testimony. (*Id.*) Defendant Wagner denied the request, but gave plaintiff the opportunity for "a written rebuttal." (*Id.*) Thus, defendant Wagner did not violate plaintiff's due process rights in connection with the requested witnesses.

Plaintiff also alleges that defendant Wagner violated his due process rights when he refused to allow plaintiff to demonstrate his alleged inability to kick defendant Prieur while wearing the MHU smock. Defendant Wagner states that plaintiff's testimony, together with a videotape of plaintiff walking, and photographs of plaintiff following the incident which showed him wearing the smock in question were sufficient evidence that plaintiff had enough freedom of movement to kick staff as alleged by the officers. (Wagner Decl. ¶ 8). Defendant Wagner determined that a physical demonstration was unnecessary, particularly because it was unclear whether a smock from Southport would have been the same as the smock as plaintiff was wearing at the time of the incident at GMCF. Defendant Wagner had video evidence of plaintiff wearing the actual smock. (*Id.*) Finally, defendant Wagner concluded that there were safety and security risks of allowing the demonstration, which were not outweighed, "given the limited evidentiary value of the physical demonstration." (*Id.*)

The right to present evidence,[28] just as the right to call witnesses is not unlimited

---

[28] The court notes that the case law speaks of plaintiff's right to present "documentary" evidence, not physical demonstrations. However, the court has analyzed the issue with reference to the standard for documentary evidence.

and may be denied based upon irrelevance or lack of necessity. *Jackson v. Prack*, No. 16-CV-7561, 2019 WL 6119010, at *7 (S.D.N.Y. Nov. 18, 2019) (citing *Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 (2d Cir. 1991)). Defendant Wagner has explained his rationale for denying plaintiff the opportunity to demonstrate his alleged inability to commit the misbehavior, and he and plaintiff had a lengthy discussion about this rationale at the disciplinary hearing. (Hummel Decl. Ex. E a 64-67). He reasonably concluded that the video tape showed plaintiff's range of motion in the actual smock that he wore on the day of the incident.[29] Thus, defendant Wagner did not violate plaintiff's due process rights when he refused to let plaintiff conduct a physical demonstration during the rehearing.[30]

Defendant Wagner found plaintiff guilty of the misbehavior and sentenced him to 270 days in SHU, together with a loss of privileges for the same amount of time and loss of six months good time.[31] (Wagner Decl. ¶ 10). Plaintiff appealed the determination, and defendant Venettozzi affirmed the disciplinary determination, but

---

[29] The video tape does not appear to have been of the incident itself, but was taken after the incident and showed plaintiff walking in the smock. Plaintiff maintained that the video tape was insufficient to show that he could lift his leg high enough to kick the officer in the groin. (Hummel Decl. Ex. E at 67). Plaintiff had the further opportunity to explain at length why he was allegedly unable to kick the officer based on the evidence. (Hummel Decl. Ex. E at 70-74).

[30] Plaintiff also alleges that the rehearing was untimely." (AC at pp.11-12, ¶ 48). As I noted in my July 31, 2020 recommendation, a challenge to the "timeliness" of plaintiff's hearing in violation of state regulations does not rise to the level of a constitutional requirement. (Dkt. No. 38 at 11 n.13). *See Brooks v. Prack*, 77 F. Supp. 3d 301, 321 (W.D.N.Y. 2014) (due process rights for an inmate disciplinary hearing do not include the right to "a speedy hearing.") Thus, any claim that the plaintiff's rehearing was not timely may be dismissed.

[31] As stated above, the loss of good time is not an issue because plaintiff executed a waiver of any claims to loss of good time. In any event, he never lost good time because the determination was ultimately reversed.

reduced the sentence to 140 days SHU, together with loss of privileges for the same amount of time, and three months recommended loss of good time. (Rodriguez Decl. Ex. G at 3). On August 17, 2020, Acting Director Rodriguez modified plaintiff's sentence to 140 days SHU, 6 days loss of privileges, and no recommended loss of good time. (Rodriguez Decl. Ex. G at 1).

I have found that defendant Wagner did not violate plaintiff's due process rights at the rehearing of the August 11th incident. Thus, defendant Venettozzi did not violate any of plaintiff's due process rights in affirming the disciplinary finding and in reducing the sentence, which Acting Director Rodriguez reduced even further. Thus, plaintiff's due process claims may be dismissed as against defendants Peacock, Wagner, and Venettozzi.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the defendants' motion for summary judgment (Dkt. No. 62) based on failure to exhaust be **DENIED**, as to defendants **RENAUD, DREW, SCARLOTTA, MORIN, SWAN, AND SCUDERI** with respect to the claims of excessive force on **August 9, 2016** and as against defendants **ROSE, PRIEUR, and VANDENBURG** with respect to the claims of excessive force on **August 11, 2016**, and it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 62) be **GRANTED IN ALL OTHER RESPECTS,** and that the consolidated amended complaint (Dkt. No. 19) be **DISMISSED IN ITS ENTIRETY** as to defendants **NESMITH, WAGNER, PEACOCK, VENETTOZZI, and JOHN DOE NURSE**

**PRACTITIONER**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: July 20, 2022

Andrew T. Baxter
U.S. Magistrate Judge